**LEAVITT LEGAL SERVICES, P.C.**
**JAMES T. LEAVITT, ESQ.**
State Bar No. 012803
601 South 6th Street
Las Vegas, Nevada 89101
Phone: (702) 385-7444 Facsimile: (702) 385-1178
Jamestleavittesq@gmail.com, Leavittecf@gmail.com
Attorney for Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| In re: | Case No.: 25-13929-gs |
|  | CHAPTER 11 SUBCHAPTER V |
| VEGAS CUSTOM GLASS LLC., | Hearing Date: November 24, 2025 |
|  | Hearing Time: 1:30 P.M. |
| DEBTOR. |  |

## DEBTOR'S MOTION TO VALUE COLLATERAL AND BIFURCATE SECURED CLAIMS

COMES NOW Debtor Vegas Custom Glass, LLC ("Debtor"), by and through undersigned counsel, and hereby moves this Honorable Court for entry of an Order pursuant to 11 U.S.C. §§ 502(b), and 506(a) and Federal Rule of Bankruptcy Procedure 3012, valuing the collateral securing certain asserted secured claims and bifurcating those claims into their secured and unsecured portions.

This Motion seeks to establish the extent, validity, and priority of liens asserted by Fox Funding Group, LLC, Alo Capital Group, LLC , E Financial Tree (Sofiagrey, LLC), and Quick Bridge Funding, in and to the Debtor's assets, including its accounts receivable valued at $92,134.57 as of the petition date and any other business collateral

### I.    Introduction

This Chapter 11 Subchapter V case was filed on July 9, 2025, and the Debtor continues to operate its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1182–1195. Debtor's

Amended Petition filed August 19, 2025, reflects that the Debtor's accounts receivable ("A/R") were valued at $92,134.57 as of the petition date.

Debtor brings this Motion under 11 U.S.C. §§ 502(b), and 506(a) and Fed. R. Bankr. P. 3012, seeking to establish the extent, validity, and priority of certain competing liens, to value the secured collateral, and to bifurcate secured claims according to the properly perfected interests of record. The Motion requests separate valuation of (1) accounts receivable and (2) other business collateral, including equipment, inventory, and deposit accounts, consistent with lien scope and priority.

Specifically, four creditors, (1) Fox Funding Group, LLC; (2) Alo Capital Group, LLC; (3) E Financial Tree (Sofiagrey, LLC); and (4) Quick Bridge Funding, assert or purport to assert security interests in the same receivable collateral. The Debtor seeks to value that collateral, determine lien priority, and clarify the proper secured status of each claim.

Debtor's accounts receivable constitute the principal collateral claimed by these creditors. However, the total accounts recievable balance of $92,134.57 cannot satisfy the competing secured claims asserted in aggregate. Therefore, a judicial determination of the collateral value and respective lien priorities is necessary to ensure accurate treatment of each claim under the Bankruptcy Code.

<u>Summary of Creditor Claims</u>

Fox Funding Group, LLC ("Fox Funding") filed Proof of Claim No. 23 asserting a total claim of $154,588.00 secured by the Debtor's accounts receivable and proceeds. The claim is based on an Agreement for the Purchase and Sale of Future Receivables dated April 1, 2025, in which Fox Funding purchased $219,000 in future receivables. Fox Funding properly perfected

its security interest by filing a UCC-1 Financing Statement (No. 2025464303-1) on April 2, 2025, covering "all accounts and proceeds." The UCC filing and supporting documentation, attached hereto as Exhibit "A", demonstrate that Fox Funding holds the first-position perfected security interest in the Debtor's accounts receivable. As of the controlling petition's date, the accounts receivable pool was valued at $92,134.57, meaning that the secured portion of Fox Funding's claim should be limited to that amount, with the remaining $62,453.43 treated as an unsecured deficiency pursuant to § 506(a).

Alo Capital Group, LLC ("Alo") filed Proofs of Claim No. 11 and 24, both asserting the same debt in the amount of $96,750.00, based on a Sale of Future Receipts Agreement dated June 9, 2025. Under that agreement, Alo Capital advanced $80,000 to the Debtor in exchange for a purchased amount of $108,000. Alo perfected its interest by filing a UCC-1 Financing Statement (No. 2025483938-2) with the Nevada Secretary of State on June 17, 2025. The filing covers a broad category of assets, including "accounts, payment intangibles, chattel paper, inventory, equipment, instruments, deposit accounts, and general intangibles." The supporting documentation, attached hereto as Exhibit "B", establishes that Alo Capital holds a second-priority perfected lien on the Debtor's accounts receivable, subordinate only to the prior filing of Fox Funding Group. Alo may also hold a first-priority lien in other business assets not covered by Fox Funding's earlier UCC filing.

E Financial Tree, aka Sofiagrey, LLC ("Sofiagrey") entered into a Receivables Purchase Agreement with the Debtor on May 19, 2025, for a purchased amount of $145,000.00. Sofiagrey, however, failed to file a proof of claim before the September 17, 2025 bar date, and its UCC-1 financing statement was recorded after the petition date. Sofiagrey's post-petition recording renders its filing void or voidable. See *In re Endresen*, 548 B.R. 258, 274 (B.A.P. 9th Cir. 2016)

(balancing equities in post-petition filings). Sofiagrey therefore does not hold a perfected security interest as of the petition date. Any claim asserted by Sofiagrey should be treated as unsecured.  The relevant agrement and UCC filing are attached as Exhibit "C."

Quick Bridge Funding engaged in three receivables-purchase transactions with the Debtor dated October 4, 2024, November 6, 2024, and January 16, 2025, totaling $153,779.37. Despite these transactions, Quick Bridge Funding did not file a UCC-1 financing statement with the Nevada Secretary of State and also failed to file a proof of claim before the bar date. Because it neither perfected its security interest nor timely asserted its claim in this proceeding, Quick Bridge Funding holds no enforceable or perfected lien against the Debtor's property and should likewise be treated as an unsecured creditor.

Based on the foregoing, the Debtor respectfully requests that this Court determine (1) that Fox Funding Group holds the first-position perfected lien on the Debtor's accounts receivable up to the value of $92,134.57; (2) that Alo Capital Group holds a second-position perfected lien subject to Fox's senior security interest; and (3) that E Financial Tree (Sofiagrey, LLC) and Quick Bridge Funding hold no perfected security interests and are properly classified as unsecured creditors. Debtor further seeks bifurcation of the secured claims of Fox Funding and Alo Capital into secured and unsecured portions consistent with the value of the collateral and lien priority established herein.

## II.    Applicable Law

Under § 506(a), an allowed claim of a creditor secured by a lien on property of the debtor is treated as a secured claim only to the extent of the value of the creditor's interest in the debtor's property, and as an unsecured claim for the balance. See 11 U.S.C. § 506(a); *In re Enewally*, 368 F.3d 1165, 1169 (9th Cir. 2004). Thus, a single debt may be divided into two distinct claims: (1)

a secured claim equal to the value of the collateral, and (2) an unsecured claim for any deficiency. See *Dewsnup v. Timm*, 502 U.S. 410, 414–15 (1992). Section 506(a) therefore bifurcates allowed claims under § 502 into secured and unsecured portions. Although *Dewsnup* ultimately held that § 506(d) does not allow a Chapter 7 debtor to "strip down" an undersecured lien that has been fully allowed under § 502, the Court confirmed that, for valuation purposes, a claim "is secured only to the extent of the judicially determined value" of the collateral. *Id*. at 417. Courts have since recognized that undersecured liens are voidable under § 506(d) only to the extent they exceed collateral value. See, e.g., *Crain v. PSB Lending Corp. (In re Crain),* 243 B.R. 75, 77–78 (Bankr. C.D. Cal. 1999).

The Supreme Court later clarified that the concept of a "secured claim" is distinct from the concept of a "security interest." In *Nobelman v. American Savings Bank*, 508 U.S. 324, 330–31 (1993), the Court explained that a "claim," whether secured or unsecured, is defined broadly by § 101(5), while the subset of claims defined as "secured claims" is determined by applying § 506(a).

Thus, outside bankruptcy, a creditor holding a lien may be considered secured regardless of collateral value; inside bankruptcy, however, a creditor is only a secured creditor to the extent its claim is classified as secured under § 506(a). As the Bankruptcy Court for the District of Nevada observed, "If the claim is not so classified, the once-secured creditor will have an unsecured claim and will thus be an unsecured creditor for purposes of the bankruptcy case." *In re Okosisi*, 451 B.R. 90, 93 (Bankr. D. Nev. 2011).

Valuation under § 506(a) must occur "in light of the purpose of the valuation and of the proposed disposition or use of such property." *Taffi v. United States (In re Taffi),* 96 F.3d 1190, 1192 (9th Cir. 1996) (en banc). The Ninth Circuit in *Taffi* held that valuation must be

accomplished "within the actual situation presented." Valuation must be accomplished within the actual situation presented. *Id*. When a debtor retains and continues using the collateral post-petition, the appropriate measure is fair market value, not foreclosure or liquidation value. *Id*. The same principle was reaffirmed in *In re Kim*, 130 F.3d 863, 865 (9th Cir. 1997), where the court emphasized that valuation must account for "the purpose of the valuation and the proposed disposition or use of the property."

Other courts are also in accord with Ninth Circuit precedent. In *Winthrop Old Farm Nurseries, Inc. v. New Bedford Institution for Savings (In re Winthrop Old Farm Nurseries, Inc.),* 50 F.3d 72, 75 (1st Cir. 1995), the First Circuit noted that valuation must reflect "the proposed post-bankruptcy reality." Likewise, *In re Penz*, 102 B.R. 826, 828 (Bankr. E.D. Okla. 1989), observed that when a debtor continues to operate and utilize its collateral, its value is measured by its contribution to the ongoing enterprise rather than by its hypothetical liquidation price.

## III.    Argument

i.    The Court Should Value the Collateral Under § 506(a) at Its Fair Market Value as of the Petition Date

Section 506(a) of the Bankruptcy Code requires that the value of a secured claim be determined "in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). Because Debtor continues to operate its glass-installation business as a going concern, the proper measure of value is fair market value, not a hypothetical foreclosure or liquidation value. See *Taffi*; *In re Kim*.

Debtor's accounts receivable total $92,134.57 as of the petition date. Those receivables represent the maximum realizable value of the collateral available to satisfy competing liens. The Court should therefore fix the value of the receivable collateral at $92,134.57 for purposes

of determining the secured status of each claimant. Any additional business assets, e.g., equipment, investments, real property, deposit accounts. may be valued separately to the extent any creditor has a properly perfected interest in such assets.

    ii.    <u>Each Creditor's Claim Must Be Classified as Secured or Unsecured According to the Value of the Collateral and the Order of Perfection.</u>

Section 506(a) divides an allowed claim into two components: a secured claim equal to the value of the collateral, and an unsecured claim for any deficiency. See *Dewsnup v. Timm*, 502 U.S. 410, 414–15 (1992). A creditor is a "secured creditor" in bankruptcy only to the extent its claim is classified as secured under § 506(a). *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 330–31 (1993).

Applying these principles, the Court should determine the extent of each creditor's secured status as follows:

    *a.  Fox Funding Group, LLC*

Fox Funding Group filed Proof of Claim No. 23 in the amount of $154,588.00, supported by an Agreement for the Purchase and Sale of Future Receivables dated April 1, 2025. Fox perfected its security interest by filing UCC-1 Financing Statement No. 2025464303-1 on April 2, 2025, covering "all accounts and proceeds." Fox therefore holds the first-priority perfected lien on the Debtor's A/R.

Because the A/R is valued at $92,134.57, Fox Funding's claim is secured to that extent and unsecured for the remaining $62,453.43. The secured portion should be treated as a Class 1 secured claim under any plan, and the balance as a general unsecured claim under § 506(a).

    *b.  Alo Capital Group, LLC*

Alo Capital Group filed Proofs of Claim Nos. 11 and 24, each asserting a claim of $96,750.00 based on a Sale of Future Receipts Agreement dated June 9, 2025. Alo perfected its interest by filing UCC-1 No. 2025483938-2 on June 17, 2025, covering "accounts, payment intangibles, chattel paper, inventory, equipment, instruments, deposit accounts, and general intangibles."

Because Fox Funding's prior filing gives it a senior lien on all accounts receivable, Alo's security interest in the same A/R is subordinate and attaches only to any remaining value after Fox Funding's secured claim is satisfied. As the A/R collateral is fully absorbed by Fox's secured amount, Alo's claim is effectively unsecured with respect to the A/R. To the extent Alo's UCC filing extends to other collateral categories such as equipment or deposit accounts, the Debtor requests that the Court determine those assets' value separately under § 506(a). Any deficiency beyond that value should be classified as unsecured.

### c.  E Financial, aka Sofiagrey, LLC

E Financial Tree entered into a Receivables Purchase Agreement dated May 19, 2025 for a purchased amount of $145,000.00. Sofiagrey failed to file a timely proof of claim and recorded its UCC-1 financing statement after the petition date, rendering the filing void or voidable. As of the controlling petition date, Sofiagrey held no perfected security interest, and its claim, if any, must be treated entirely as unsecured under § 506(a). The Debtor therefore requests an order determining that Sofiagrey's claim is unsecured for all purposes of this case.

### d.  Quick Bridge Funding

Quick Bridge Funding engaged in three receivables-purchase transactions with the Debtor between October 2024 and January 2025, totaling $153,779.37. Quick Bridge Funding did not

file a UCC-1 financing statement with the Nevada Secretary of State and failed to submit a proof of claim before the bar date of September 17, 2025. Without perfection or a timely claim, Quick Bridge Funding has no enforceable lien against the estate and must be classified as a general unsecured creditor.

iii.    The Proposed Valuation and Bifurcation Comport with § 506 and Established Precedent

This treatment faithfully applies the Bankruptcy Code's distinction between "secured claims" and "security interests." Under § 506(a), claims are secured only to the extent of the value of the collateral, and unsecured for any excess. Debtor's proposed valuation aligns with the reasoning in *Nobelman*, *Okosisi*, and *Taffi*, and ensures that each creditor's status is determined according to its perfected interest and the collateral's fair-market value as of the petition date. This approach provides an equitable distribution among creditors and accurately reflects the Debtor's ongoing operations and Debtor's true asset value.

**IV.    Conclusion**

For the foregoing reasons, the Debtor respectfully requests that this Court enter an Order pursuant to 11 U.S.C. §§ 502(b), and 506(a) and Fed. R. Bankr. P. 3012, valuing the Debtor's accounts receivable collateral at $92,134.57 as of the petition date, determining the lien priority and secured status of each creditor consistent with the foregoing analysis, and bifurcating each claim into its secured and unsecured portions. Debtor further requests such other and further relief as the Court deems just and proper.

Dated this 16th day of October 2025.          /S/ James T. Leavitt
                                              **JAMES T. LEAVITT, ESQ.**
                                              601 South 6th Street
                                              Las Vegas, Nevada 89101
                                              *Attorney for Vegas Custom Glass*

**LEAVITT LEGAL SERVICES, P.C.**
**JAMES T. LEAVITT, ESQ.**
State Bar No. 012803
601 South 6th Street
Las Vegas, Nevada 89101
Phone: (702) 385-7444 Facsimile: (702) 385-1178
Jamestleavittesq@gmail.com, Leavittecf@gmail.com
Attorney for Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: 25-13929-gs |
| | CHAPTER 11 SUBCHAPTER V |
| | Hearing Date: November 24, 2025 |
| VEGAS CUSTOM GLASS LLC., | Hearing Time: 1:30 p.m. |
| | |
| _____DEBTOR._____ | |

**PROPOSED ORDER GRANTING DEBTOR'S MOTION TO VALUE COLLATERAL**
**AND BIFURCATE SECURED CLAIMS**

This matter came before the Court on Debtor's Motion to Value Collateral and Bifurcate Secured Claims (the "Motion") filed pursuant to 11 U.S.C. §§ 502(b) and 506(a) and Federal Rule of Bankruptcy Procedure 3012. The Court having reviewed the Motion, all supporting documentation and exhibits, and any responses or objections filed thereto, and being otherwise fully advised in the premises, and good cause appearing therefor;

FINDINGS OF FACT

The Court hereby finds as follows:

1. Vegas Custom Glass, LLC (the "Debtor") filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code on July 9, 2025.

2. The Debtor continues to operate its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1182-1195.

3. As of the petition date, the Debtor's accounts receivable had a fair market value of $92,134.57.

4. **Fox Funding Group, LLC** filed Proof of Claim No. 23 asserting a total claim of $154,588.00 based on an Agreement for the Purchase and Sale of Future Receivables dated April 1, 2025, and perfected its security interest by filing UCC-1 Financing Statement No. 2025464303-1 on April 2, 2025, covering "all accounts and proceeds."

5. **Alo Capital Group, LLC** filed Proofs of Claim Nos. 11 and 24, both asserting the same debt in the amount of $96,750.00, based on a Sale of Future Receipts Agreement dated June 9, 2025, and perfected its interest by filing UCC-1 Financing Statement No. 2025483938-2 on June 17, 2025, covering "accounts, payment intangibles, chattel paper, inventory, equipment, instruments, deposit accounts, and general intangibles."

6. **E Financial Tree (Sofiagrey, LLC)** entered into a Receivables Purchase Agreement with the Debtor on May 19, 2025, for a purchased amount of $145,000.00, but failed to file a proof of claim before the September 17, 2025 bar date and recorded its UCC-1 financing statement after the petition date.

7. **Quick Bridge Funding** engaged in three receivables-purchase transactions with the Debtor totaling $153,779.37, but did not file a UCC-1 financing statement with the Nevada Secretary of State and failed to file a proof of claim before the bar date.

8. Fox Funding Group, LLC holds the first-position perfected security interest in the Debtor's accounts receivable based on the priority of its April 2, 2025 UCC-1 filing.

9. Alo Capital Group, LLC holds a second-position perfected security interest in the Debtor's accounts receivable, subordinate to Fox Funding Group, LLC.

10. E Financial Tree (Sofiagrey, LLC) does not hold a perfected security interest as of the petition date due to its post-petition UCC filing.

11. Quick Bridge Funding does not hold a perfected security interest due to its failure to file a UCC-1 financing statement.

CONCLUSIONS OF LAW

The Court hereby concludes as follows:

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (O).

3. Pursuant to 11 U.S.C. § 506(a), an allowed claim of a creditor secured by a lien on property of the debtor is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim.

4. The appropriate standard of valuation under § 506(a) is fair market value, measured as of the petition date, in light of the Debtor's continued operation of its business as a going concern.

5. The fair market value of the Debtor's accounts receivable as of the petition date is $92,134.57.

6. Fox Funding Group, LLC holds a first-priority perfected security interest in the Debtor's accounts receivable.

7. Alo Capital Group, LLC holds a second-priority perfected security interest in the Debtor's accounts receivable and may hold a first-priority security interest in other business assets including equipment, inventory, instruments, deposit accounts, and general intangibles to the extent not covered by Fox Funding Group, LLC's prior UCC filing.

8. E Financial Tree (Sofiagrey, LLC) and Quick Bridge Funding do not hold perfected security interests in any assets of the Debtor's estate.

### ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

1. The Motion is **GRANTED**.

2. The fair market value of the Debtor's accounts receivable as of the petition date is hereby determined to be **$92,134.57**.

3. **Fox Funding Group, LLC** (Proof of Claim No. 23):

- Holds an allowed secured claim in the amount of **$92,134.57**, representing the full value of the Debtor's accounts receivable; and

- Holds an allowed general unsecured claim in the amount of **$62,453.43**, representing the deficiency between its total claim of $154,588.00 and the value of the collateral securing such claim.

4 . **Alo Capital Group, LLC** (Proof of Claim Nos. 11 and 24):

- The duplicate claims shall be consolidated into a single claim in the amount of $96,750.00;

- With respect to the Debtor's accounts receivable, Alo Capital Group, LLC's security interest is subordinate to Fox Funding Group, LLC's first-priority lien, and because the accounts receivable are fully exhausted by Fox Funding Group, LLC's secured claim, Alo Capital Group, LLC holds an **unsecured claim** with respect to the accounts receivable;

- Alo Capital Group, LLC may hold a perfected security interest in other business assets of the Debtor including equipment, inventory, instruments, deposit accounts, and general intangibles as described in UCC-1 Financing Statement No. 2025483938-2; and

- The value of any such other collateral and the secured/unsecured bifurcation of Alo Capital Group, LLC's claim with respect to such other collateral shall be determined upon motion by any party in interest or as part of plan confirmation proceedings.

5 . **E Financial Tree (Sofiagrey, LLC)** holds no perfected security interest in any assets of the Debtor's estate as of the petition date, and any claim asserted by E Financial Tree (Sofiagrey, LLC) shall be treated as a general **unsecured claim**.

6 . **Quick Bridge Funding** holds no perfected security interest in any assets of the Debtor's estate, and any claim asserted by Quick Bridge Funding shall be treated as a general **unsecured claim**.

7. The secured and unsecured portions of each claim shall be treated accordingly in any plan of reorganization filed by the Debtor and in all further proceedings in this case.

8. The Debtor shall serve a copy of this Order on all creditors and parties in interest within seven (7) days of entry.

9. This Court retains jurisdiction to enforce the terms of this Order and to resolve any disputes arising from its implementation.

IT IS SO ORDERED.

**Submitted by:**

*/S/ James T Leavitt*
**LEAVITT LEGAL SERVICES, P.C.**
**JAMES T. LEAVITT, ESQ.**
State Bar No. 012803
601 South 6th Street
Las Vegas, Nevada 89101
*Attorney for Vegas Custom Glass*

### *LR 9021 CERTIFICATION*

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

_____    The court has waived the requirement set forth in LR 9021(b)(1).

_____    No party appeared at the hearing or filed an objection to the motion.

___    I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated above.

_____    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

# # #

## CERTIFICATE OF SERVICE

On the 16th day of October, 2025, I served the following document(s):

***MOTION TO VALUE COLLATERAL AND BIFURCATE SECURED CLAIMS***

I served the above-named document(s) by depositing a true and complete copy of the above named document, first class postage paid into the United States Mail, via US Mail to the following persons as listed, other than those served electronically by the court as denoted with an asterisk next to the name.

**X** (ELECTRONIC SERVICE) Under Local Rule 5005 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

**X** (UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first-class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date written above.

Fox Funding
803 S 21st Ave
Hollywood, FL 33020-6962

Alo Capital Group
18851 NE 29th Ave
Miami, FL 33180-2847

Quickbridge
46 Discovery Suite 200
Irvine, CA 92618-3123

ALO Capital Group
c/o Giuliano Law PC
445 Broadhollow Rd.Suite 25
Melville, NY 11747-3645

E Financial Tree
201 Broad St Suite 1002
Stamford, CT 06901-2004

**I declare under penalty of perjury that the foregoing is true and correct.**

DATED this 16th day of October, 2025.

Melissa Milroy                        /s/ Melissa Milroy
**(Name of Declarant)**              **(Signature of Declarant)**

# Exhibit "A"

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Wolters Kluwer Lien Solutions 800-331-3282**

B. E-MAIL CONTACT AT FILER (optional)
**DL-WK-UCC-FILING@wolterskluwer.com**

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
**Wolters Kluwer Lien Solutions**
**330 N. Brand Blvd., Suite 700**
**Glendale, CA 91203, USA**

| Filed in the Office of | Initial Filing Number |
| --- | --- |
| | **2025464303-1** |
| | Filed On |
| | **April 2, 2025 10:21 PM** |
| Secretary of State | Number of Pages |
| State Of Nevada | **1** |

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| **VEGAS CUSTOM GLASS LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **6255 MCLEOD DR** | **LAS VEGAS** | **NV** | **89120** | **USA** |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| **C T CORPORATION SYSTEM, AS REPRESENTATIVE** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **330 N BRAND BLVD, SUITE 700; ATTN: SPRS** | **GLENDALE** | **CA** | **91203** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**SECURED PARTY HAS PURCHASED AN INTEREST IN ACCOUNTS AND PROCEEDS FROM DEBTOR, DESCRIBED AS "RECEIPTS" IN THE AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, AND AS A RESULT, SECURED PARTY HAS A SECURITY INTEREST IN SUCH RECEIPTS. "RECEIPTS" MEANS ALL ACCOUNTS RECEIVABLE AND PAYMENT RIGHTS ARISING OUT OF OR RELATING TO FOR MERCHANT'S SALE OR DELIVERY OF GOODS AND/OR SERVICES DUE TO DEBTOR AFTER THE DATE OF THE AGREEMENT, WHETHER PAID DIRECTLY BY MERCHANT'S CUSTOMERS OR PAID BY OTHERS ON MERCHANT'S CUSTOMERS' BEHALVES OR AS REIMBURSEMENTS. DEBTOR AND SECURED PARTY INTEND THAT THE SALE OF RECEIPTS IS A SALE AND NOT AN ASSIGNMENT FOR SECURITY. SECURED PARTY HAS BEEN GRANTED A SECURITY INTEREST IN: ALL ACCOUNTS AND PROCEEDS.**

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: | | | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: | |
| --- | --- | --- | --- | --- |
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**103588743-71402123**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# Exhibit "B"

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| **Online Dept 916-313-8900** |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| **online@ficoso.com** |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|
| **FIRST CORPORATE SOLUTIONS** |
| **914 S STREET** |
| **SACRAMENTO, CA 95814, USA** |

| Filed in the Office of | Initial Filing Number |
|---|---|
| *(signature)* | 2025483938-2 |
| | Filed On |
| | **June 17, 2025 02:41 PM** |
| Secretary of State | Number of Pages |
| State Of Nevada | 2 |

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **VEGAS CUSTOM GLASS LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **6255 MCLEOD DR STE 21** | **LAS VEGAS** | **NV** | **89120** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **VEGAS CUSTOM GLASS LLC** | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **2470 CHANDLER AVE STE 12** | **LAS VEGAS** | **NV** | **89120** | **USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **FIRST CORPORATE SOLUTIONS, AS REPRESENTATIVE** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **914 S STREET** | **SACRAMENTO** | **CA** | **95811** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**ACCOUNTS; PAYMENT INTANGIBLES; CHATTEL PAPER; INVENTORY; EQUIPMENT; INSTRUMENTS, INCLUDING BUT NOT LIMITED TO PROMISSORY NOTES; INVESTMENT PROPERTY; DOCUMENTS; DEPOSIT ACCOUNTS; LETTER OF CREDIT RIGHTS; AND GENERAL INTANGIBLES.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien ☐ Non-UCC Filing | |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☑ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
   **[UCC1-1627066]**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# alo capital group

## Sale of Future Receipts Agreement

This Sale of Future Receipts Agreement ("Agreement") effective, __JUNE 9TH__, 2025, is made by and between Alo Capital Group LLC ("Buyer", "we", or "us"), each Seller identified below ("Seller" or "you"), and each person who signs this Agreement as a Guarantor (each a "Guarantor").

### Seller and Guarantor Information

| Seller Legal Name(s) | D/B/A | Entity type/where organized |
|---|---|---|
| VEGAS CUSTOM GLASS LLC | VEGAS CUSTOM GLASS | LIMITED LIABILITY COMPANY |

| Primary Contact Person and Address | |
|---|---|
| | Name/title: VINCENT-JOSEPH TARINE REGALA/ OWNER |
| | Address: 6255 MCLEOD DR STE 21 LAS VEGAS, NV 89120 |
| | Phone: 7026090781 |
| | Email: Vincent@vegascustomglass.com |

| Guarantor(s) | |
|---|---|
| | VINCENT-JOSEPH TARINE REGALA; |

### Purchase Information

The transaction contemplated by this Agreement is a purchase of Future Receipts. "Future Receipts" means all payments received by Seller, or its right to receive such payments, in the ordinary course of Seller's business, including but not limited to (a) payments made by cash, check, Automated Clearing House ("ACH") or other electronic transfer; (b) payments, or rights to payments, made by credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card"); and (c) payments made by any other form. You will deliver the entire Purchased Amount of Future Receipts to us over time by allowing us to debit the Periodic Amount (which is subject to adjustment) on each Remittance Day. We will debit the Periodic Amount from one or more deposit accounts authorized by you for this purpose (each, an "Authorized Account").

| Purchased Amount of Future Receipts | How we calculated the Periodic Amount |
|---|---|
| $ 108,000.00 | The Periodic Amount is the Specified Percentage of the average sales revenue we estimate you will receive. Our estimate is based on a review of your past revenue. We used information you provided to us to make this estimate. Beginning on the first Remittance Day, the Periodic Amount will be the amount identified on this page. You have the right to adjust the Periodic Amount to better reflect actual revenue as it changes over time. Please refer to Section 4 (Reconciliation Process) to learn how you can adjust the Periodic Amount. |
| **Purchase Price** | |
| $ 80,000.00 | |
| **Periodic Amount** | **Remittance Days will occur (The option marked ⊠ applies):** |
| $ 4,500.00 | ☐ Every Week Day (i.e., Monday through Friday) |
| **Specified Percentage** | ■ Weekly* |
| 8.53 % | *We will notify you of the day or days on which each Remittance Day will occur. |

| Amounts Deducted from Purchase Price: | | |
|---|---|---|
| Prior balance paid to Buyer............................................................. | $ | N/A |
| Prior balance paid to third parties ................................................. | $ | N/A |
| Origination fee ............................................................................... | $ | 4,000.00 |
| Total Amount Deducted From Purchase Price | $ | 4,000.00 |
| **Net Funded Amount** | $ | 76,000.00 |
| This is the Purchase Price minus the Total Amount Deducted from Purchase Price. This is the total dollar amount of funds to be deposited into your Authorized Account. | | |



**Early Delivery Schedule**

Subject to the conditions described in the Agreement, if during any Early Delivery Window described below, the sum of all Future Receipts that Seller has delivered to Buyer by Seller is equal to the applicable Discounted Purchase Amount described below, then Buyer will accept the Discounted Purchase Amount in full satisfaction of Seller's contractual obligations under the Agreement.

| EARLY DELIVERY WINDOW<br><br>Calendar days immediately following disbursement of funds | DISCOUNTED PURCHASE AMOUNT |
|---|---|
| 0-30 DAYS | $ 92,000.00 |
| 31-45 DYAS | $ 96,000.00 |
| 46-60 DAYS | $ 100,000.00 |
|  | $ |

Seller's right to exercise the Early Delivery Option is subject to the following conditions (unless waived in writing by Buyer):

- None of the funds used to pay the Discounted Purchase Amount have been obtained from Buyer.

- Seller is not in breach of this Agreement at the time Seller exercises the Early Delivery Option.

- Seller must remit (and Buyer must receive) the applicable Discounted Purchase Amount in immediately available U.S. funds not later than 11:59 pm of the last date of the applicable Early Delivery Window.  (Seller acknowledges that it should contact Buyer to obtain instructions for wire/ACH or alternative payment instructions several days before it intends to remit the Discounted Purchase Amount.)

Seller's right to exercise the Early Delivery Option terminates immediately after the last day of the last Early Delivery Window.

1



1. **Sale of Future Receipts.** Seller hereby sells and assigns to Buyer, without recourse, the Purchased Amount of Future Receipts described above. As payment for the Purchased Amount, Buyer agrees to pay Seller the Purchase Price shown above and Seller will receive funds equal to the Net Funded Amount.

2. **Buyer's Acceptance of Agreement.** The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Net Funded Amount, shown above, into any Authorized Account. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to any Authorized Account and the ability to withdraw the initial Periodic Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

3. **Delivery of Purchased Amount.** If Remittance Days are to occur on a frequency other than daily, then Buyer will notify Seller on or before the date Buyer has accepted this Agreement, of the day of the week on which Remittance Days will occur. The Purchased Amount will be delivered to Buyer each Remittance Day in a series of remittances each equal to the Periodic Amount. Seller authorizes Buyer to debit an Authorized Account on each Remittance Day, by initiating an ACH debit entry or by creating a remotely created check or electronically created item, in the amount of the initial Periodic Amount or, following any adjustment pursuant to Section 4 (Reconciliation Process), the adjusted Periodic Amount. For this purpose, Seller shall provide Buyer with all required account information and will provide an appropriate ACH authorization to Buyer. Seller agrees not to change any account information without prior written consent from Buyer. If a Remittance Day occurs on a bank holiday, Seller authorizes Buyer to initiate a debit entry on the next day on which Seller's bank is open in an amount equal to the Periodic Amount and, if Remittance Days are scheduled to occur every Week Day, Buyer may initiate the debit entry in an amount equal to the Periodic Amount scheduled for the next day, plus the Periodic Amount that would have been debited on the preceding bank holiday.

4. **Reconciliation Process (IMPORTANT PROTECTION FOR SELLER).** The Periodic Amount is based on an estimate of the Specified Percentage of Seller's Future Receipts. At any time, Seller or Buyer have the right to require a new review of Seller's revenue for the purpose of evaluating whether the Periodic Amount continues to accurately reflect the Specified Percentage of Seller's actual revenue for the period reviewed (a "reconciliation").

   a. **How Seller may Request a Reconciliation**. Seller may request a reconciliation by sending an email to info@alocapitalgroup.com.

   b. **How Buyer may Request a Reconciliation.** Buyer may request a reconciliation in writing via regular mail or e-mail.

   c. **Reconciliation Review.** After receiving or making a request for reconciliation pursuant to this Agreement, Buyer shall calculate Seller's average revenue for the 60-day period preceding the reconciliation request (the "Review Period"). Seller shall cooperate with any reconciliation by providing bank statements or other records of Seller's actual revenue received during the Review Period ("Reconciliation Information"). Reconciliation Information may be provided electronically. Seller shall also provide Buyer with any assistance or other information needed to access or view any Reconciliation Information. Upon receipt of the Reconciliation Information, Buyer shall promptly (but no later than 3 business days following such receipt) calculate whether the total of all Periodic Amounts remitted to Buyer during the Review Period was greater than the Specified Percentage of Seller's actual revenue during the Review Period (an "excess") or less than the Specified Percentage of Seller's actual revenue during the Review Period (a "shortfall").

   d. **Adjusting the Periodic Amount.** If there was an excess, then Buyer shall decrease the Periodic Amount for each subsequent Remittance Day. If there was a shortfall, then Buyer may (but is not required to) increase the Periodic Amount for each subsequent Remittance Day. In either case, Buyer shall adjust the Periodic Amount to an amount equal to the Specified Percentage of Seller's reasonably anticipated average revenue, based on the Reconciliation Information. After an adjustment, the Periodic Amount shall remain unchanged until a subsequent adjustment occurs in accordance with this Section.

   e. **Failure to Provide Reconciliation Information.** If Seller requests a reconciliation and fails to provide the Reconciliation Information within 10 calendar days after Seller's reconciliation request, Buyer may consider Seller's reconciliation request withdrawn. If Buyer requests a reconciliation and Seller fails to provide the Reconciliation Information within 10 calendar days after Buyer's reconciliation request, Buyer may adjust the Periodic Amount based on the best information reasonably available to Buyer.



**5. Changing the Remittance Day.** The parties may change the frequency of the Remittance Day pursuant to this Section. The effective date of any change to the Remittance Day is referred to herein as the "Change Effective Date". Any change to the Remittance Day will be accompanied by a change to the Periodic Amount immediately following the Change Effective Date. The process for requesting changes to the Remittance Day and calculation of the Periodic Amount is described below.

    a.   <u>Changing Remittance Day to occur each Week Day</u>. Either Buyer or Seller may request that a weekly Remittance Day be changed to occur on each Week Day. The party requesting a change must notify the other party  in accordance with Section 18 (Notices). The Change Effective Date shall take effect promptly, but no later than one week from the date such notice is either sent or received by Buyer. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to the Periodic Amount immediately prior to the Change Effective Date, divided by five.

    b.   <u>Changing Remittance Day to occur weekly</u>. When the Remittance Day is scheduled to occur each Week Day, the Remittance Day may be changed to occur weekly, but only if both parties agree to such change in writing (which may be memorialized in an electronic record, including email). To be effective, both parties must agree on the day each Remittance Day will occur. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to the Periodic Amount immediately prior to the Change Effective Date, multiplied by five.

    c.   <u>Effect on reconciliation</u>. Following any Change Effective Date, subsequent adjustments to the Periodic Amount pursuant to Section 4 (Reconciliation Process) shall account for the change in the frequency of the Remittance Day as described above.

**6. Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN).** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer. Buyer assumes the risk that Future Receipts may be remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business goes bankrupt or Seller otherwise ceased operations in the ordinary course of business. Buyer is buying the Purchased Amount knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount and Seller retains no legal or equitable interest therein.

**7. Fees and Charges.** The fees and charges owed by Seller are as described in this Agreement. Some or all of the Origination Fee may be paid to a broker. Otherwise, Buyer is NOT CHARGING ANY BROKER FEES to Seller. If Seller is charged another such fee, Seller acknowledges that it is not being charged by Buyer. In addition to the Origination Fee that has been deducted from the Purchase Price, and except as prohibited by applicable law, Seller agrees to pay the following fees and charges described below:

    a.   <u>Returned Entry Fee</u>. If any ACH entry, check, or electronically created item is returned for insufficient funds, then Seller will pay Buyer a returned entry fee of $50. In addition, Seller will reimburse Buyer for any charges incurred by Buyer resulting from the returned ACH entry, check, or electronically created item. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement.

    b.   <u>Monthly Service Fee</u>. Unless waived by Buyer, Seller agrees to pay a monthly service fee of $____ per month until the full Purchased Amount is delivered to Buyer, or the expiration of one year, whichever occurs first.

**8. Early Delivery Option.** If this Agreement contains an Early Delivery Schedule, then Seller may at its option elect to pay the remaining balance of the Purchased Amount to Buyer on an accelerated basis in a discounted amount described in the Early Delivery Schedule attached to this Agreement (the "Early Delivery Option"). The Early Delivery Option is subject to any conditions identified in the Early Delivery Schedule.

**9. Credit Report and Financial Information Authorizations.**

    a.   Seller and each of the Guarantors signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of the Guarantors  for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its owners, and (iii) to contact personal and business references provided by Seller to Buyer, at any time



now or for so long as Seller and/or Guarantors continue to have any obligations to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

b. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, banking or financial statements, tax returns, etc., as Buyer deems necessary and reasonable prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

c. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10. **Authorization to Contact Current and Prior Banks.** Seller authorizes all of its banks and brokers and its Payment Card processor(s) to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon a breach of this Agreement. Seller hereby further authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collection purposes and in order to confirm that Seller is exclusively using an Authorized Account for the deposit of all Future Receipts of the Seller.

11. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

12. **Representations, Warranties and Covenants of Seller.** As of the date of this Agreement and, unless expressly stated otherwise, continuing until Buyer has received the Purchased Amount and all fees and charges due under this Agreement, Seller represents, warrants and covenants to Buyer as follows:

a. **No Interference.** Seller must deposit all Future Receipts into an Authorized Account on a daily basis and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into an Authorized Account on a daily basis. Seller agrees not to (i) change any Authorized Account without the express written consent of Buyer, (ii) create any new depository account, (iii) revoke Buyer's authorization to debit an Authorized Account, (iv) close an Authorized Account without the express written consent of Buyer or, (v) take any other action that denies, or interferes with, Buyer's rights under this Agreement, including but not limited to Buyer's right to receive its share of revenue received by Seller.

b. **Stacking Prohibited.** Seller shall not, without Buyer's prior written consent, enter into: (a) any other agreement for the sale of Future Receipts, or (b) any loan agreement that encumbers Seller's Future Receipts or requires daily payments. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

c. **Financial Condition and Financial Information.** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly and accurately represent the financial condition of Seller at such dates. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations at the time they are provided. Seller further agrees to authorize the release of any past or future tax returns to Buyer.

d. **Compliance with Law and Governmental Approvals.** Seller is in compliance and shall comply with all applicable federal, state and local laws, rules and regulations and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the businesses in which it is presently engaged and/or will engage in hereafter.



e. **Authority to Enter Into This Agreement.** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

f. **Change of Name or Location or Sale or Closing of Business.** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer.  Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer.  As of the date of this Agreement, Seller does not plan to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller will not voluntarily close its business on a temporary basis for renovations, repairs, or any other voluntary purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller.  Prior to any such closure, Seller will provide Buyer 10 calendar days' notice to the extent practicable.

g. **No Pending or Contemplated Bankruptcy as of the Date of this Agreement.**  As of the date of this Agreement: (a) Seller has not filed, and does not plan to file, any petition for bankruptcy protection under Title 11 of the United States Code, (b) there has been no involuntary petition brought or pending against Seller, and (c) Seller has not received any communication from any third party indicating that an involuntary petition will be filed against Seller.  Seller has not consulted with a bankruptcy attorney or a debt relief organization within six months prior to the date of this Agreement.  Seller further warrants that, as of the date of this Agreement, it does not plan to engage the services of a debt relief organization.

h. **Seller to Pay Taxes Promptly.**  Seller will promptly pay all necessary taxes and other assessments, including but not limited to employment, sales and use taxes.

i. **No Violation of Prior Agreements.**  Seller's execution and performance of this Agreement does not conflict with and will not violate any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement that prohibits the sale or pledge of Seller's Future Receipts.

j. **Seller's Knowledge and Representation.**  Seller represents, warrants, and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

k. **Accurate and Complete Information.** Seller represents, warrants, and agrees that all information provided to Buyer and all statements made to Buyer relating to this transaction in any way have been truthful, accurate, and complete.  Seller further agrees that Seller will be truthful in all future statements to Buyer, and will provide Buyer with accurate and complete information regarding Seller's business as required by this Agreement.

l. **Seller as a Commercial Entity.**  Seller is a sophisticated business entity familiar with the type of transaction described under this Agreement, and has had a full opportunity to consult with counsel of their choice, and has consulted with counsel or has decided not to avail themselves of that opportunity.

**13.  Rights of Buyer.**

a. **Security Interest and Security Agreement.** To secure Buyer's interest in the Receipts to be delivered pursuant to this Agreement and to secure all other of Seller's obligations to Buyer hereunder Seller hereby grants Buyer a continuing security interest in, and pledges to Buyer, all of the following business assets of Seller, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: accounts; payment intangibles; chattel paper; inventory; equipment; instruments, including but not limited to promissory notes; investment property; documents; deposit accounts; letter of credit rights; and general intangibles. For purposes of this security interest, each of the terms used herein that is defined by the Uniform Commercial Code ("UCC") shall have the meanings ascribed to those terms under the UCC. Seller further agrees that, with or without a breach of this Agreement, Buyer may contact account debtors obligated to pay any of Seller's accounts, payment intangibles, or chattel paper, to notify them of the assignment of any such accounts, intangibles, and chattel paper, and to instruct them to make payment or otherwise render performance to or for the benefit of Buyer.



b. **Financing Statements.** Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit any Authorized Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

c. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter during regular business hours, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer; and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

d. **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions, (ii) that such communications and contacts are not unsolicited or inconvenient, and (iii) that any such contact may be made at any phone number, email address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

e. **ACH Authorization.** Seller represents and warrants that, with respect to any authorization provided by Seller to permit Buyer to initiate ACH debit or credit entries to an Authorized Account ("ACH Authorization"): (i) each Authorized Account is solely owned by Seller; (ii) any person executing an ACH Authorization on behalf of Seller is an authorized signer on the Authorized Account and has the power and authority to authorize Buyer to initiate ACH transactions to and from the Authorized Account, and (iii) the Authorized Account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes. If an ACH entry is rejected by Seller's bank for any reason other than a stop payment order placed by Seller with its bank, including without limitation insufficient funds, Seller agrees that Buyer may resubmit up to two times any ACH entry that is dishonored. Seller's bank may charge Seller fees for unsuccessful ACH entries. Seller agrees that Buyer will have no liability to Seller for such fees. In the event Buyer makes an error in processing any ACH entry, Seller authorizes Buyer to initiate ACH entries to the applicable Authorized Account to correct the error. Seller acknowledges that the origination of ACH entries to and from an Authorized Account must comply with applicable law and applicable network rules. Seller agrees to be bound by the Rules and Operating Guidelines of Nacha (formerly known as the National Automated Clearing House Association). Seller will not dispute any ACH entry initiated pursuant to an ACH Authorization, provided the entry corresponds to the terms of the ACH Authorization. Seller requests the bank that holds the Authorized Account honor all ACH entries initiated in accordance with an ACH Authorization.

14. **Remedies for Seller's Breach of this Agreement.** If Seller violates or fails to comply with any term or covenant in this Agreement, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

a. Buyer may increase the Specified Percentage to 100% and may adjust the Periodic Amount to reflect the new Specified Percentage.

b. Buyer shall have the right to collect the full undelivered Purchased Amount plus all fees and charges (including collection and legal fees as more fully described in this Agreement) assessed under this Agreement, which will become due and payable in full immediately.

c. If Buyer engages the services of legal counsel (who is not Buyer's employee) or the services of a third-party collection agent to enforce Buyer's rights as a result of Seller's breach, then Seller shall advance to Buyer an amount equal 25% of the undelivered Purchased Amount (the "Collection Charges Advance") which shall be applied to Buyer's actual costs to enforce its rights under this Agreement. In the event the Collection Charges Advance exceeds Buyer's actual costs of enforcement, Seller shall be entitled to a refund of any excess.



d.   Buyer may enforce the provisions of the Guaranty of Performance against each Guarantor.

e.   Buyer may require Seller to pay Buyer all reasonable costs associated with Seller's breach.  Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit.  In any such arbitration or lawsuit, under which Buyer shall recover judgment against Seller, Seller shall be liable for all of Buyer's costs, including but not limited to all reasonable attorneys' fees and court costs.  However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

f.   Buyer may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of Seller's banking accounts for all sums due to Buyer.

g.   Subject to the arbitration provisions of this Agreement, all rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of breach, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

15.  **Modifications, Amendments.**   No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same is in writing and signed by Buyer.

16.  **Assignment.**   Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

17.  **Multiple Sellers.**   If more than one person or entity is listed as a Seller above, then the term "Seller" refers collectively to all Sellers who have signed the signature page of this Agreement.  The term "Future Receipts" refers to the Future Receipts of each Seller and the calculation of the initial Periodic Amount and any adjustment to the Periodic Amount shall be based on an aggregate of the actual or projected sales revenue of all the Sellers.  Each Seller agrees that Buyer's purchase of Future Receipts hereunder constitutes a purchase of the Future Receipts of all the Sellers.  Each Seller agrees that it is jointly and severally liable to Buyer for the obligation to deliver the Purchased Amount from its own Future Receipts.  Each Seller agrees that the release of any other Seller from any obligations under this Agreement, whether in whole or in part, will not limit, reduce, release, or impair such Seller's obligations to Buyer, including the obligation to deliver the undelivered balance of the Purchased Amount.  Each Seller designates the Primary Contact Person identified above as its authorized representative for all purposes related to this Agreement and any related transactions.  Buyer may treat any notice or instruction received from the Primary Contact Person as a notice or instruction from all Sellers.

18.  **Notices.**

a.   **Notices from Buyer.**   Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller and Guarantor (as applicable) by regular mail or (at Buyer's option) by e-mail to the Primary Contact Person.  Seller and each Guarantor agrees that the Primary Contact Person is authorized to receive all communications on behalf of Seller and each Guarantor.  Notices sent by e-mail are effective when sent.  Notices sent by regular mail become effective three days after mailing to the Primary Contact Person at the address set forth above or such new address communicated by the Primary Contact Person to Buyer pursuant to this Section.

b.   **Notices from Seller and Guarantor.**   Unless another method of notice to Buyer is specifically described in this Agreement, Seller and Guarantor may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion.  Otherwise, any notices or other communications from Seller and Guarantor to Buyer must be delivered by certified mail, return receipt requested, to Buyer at 1515 Pine Street, Lakewood, NJ 08701.  Notices sent to Buyer shall become effective only upon receipt by Buyer.

19.  **Binding Effect, Governing Law, Venue and Jurisdiction.**   This Agreement shall be binding upon and inure to the benefit of Seller, Buyer, Guarantor and their respective successors and assigns, except that neither Seller nor Guarantor shall have the right to assign its respective rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion.  Except as set forth in the Arbitration section, this Agreement shall be governed by and construed in accordance with the laws of the state of Florida, without regard to any applicable principles of conflicts of law.  Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so

elects, be instituted in any court sitting in Florida or New York, (the "Acceptable Forums"). Each Seller and Guarantor agrees that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, each Seller and Guarantor waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum. Unless prohibited by law, Buyer, Seller and Guarantor further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

20. **Survival of Representations, Warranties and Covenants.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

21. **Interpretation.** All parties hereto have had the opportunity to review this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice or have been provided sufficient opportunity to have an attorney of their choosing review the Agreement. No construction determinations shall be made against Buyer as drafter.

22. **Entire Agreement and Severability.** This Agreement embodies the entire agreement among Seller, Guarantor, and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

23. **Execution.** Facsimile signatures, or any other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes. The parties agree that if a duly authorized representative of each of the parties signs this Agreement and transmits such Agreement to the other party via facsimile or electronically transmitted portable document format, such transmission shall be treated in all manner and respects as an original signature (or counterpart thereof) and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of a party hereto, each other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine or electronic transmission in portable document format to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or electronic transmission in portable document format as a defense to this Agreement and each such party forever waives any such defense. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

24. **Authorization to Contact.**

   a. **Authorization to Contact by Phone.** Seller and Guarantor authorize Buyer, its affiliates, agents and independent contractors to contact Seller or Guarantor at any telephone number Seller or Guarantor provide to Buyer or from which Seller or Guarantor places a call to Buyer, or any telephone number where Buyer believes it may reach Seller or Guarantor, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller or Guarantor incurs charges for receiving such communications.

   b. **Authorization to Contact by Other Means.** Seller and Guarantor also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller and Guarantor. Seller and Guarantor expressly consent to conduct business by electronic means.

25. **JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH PARTY MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ACKNOWLEDGE THEIR RIGHT TO REVIEW THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**



26. <u>CLASS ACTION WAIVER</u>.  BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS.  EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTIES AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY.  TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR A COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT), AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

27. <u>ARBITRATION</u>.  IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT.  IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE.  IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR THE FORUM.  BUYER WILL PROMPTLY REIMBURSE SELLER OR GUARANTOR FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES.  IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR FORUM RULES.  SELLER AND GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY.  BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID.  THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES.  THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA.  ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION.  THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

28. <u>RIGHT TO OPT OUT OF ARBITRATION</u>.  SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT.  FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: 1515 PINE STREET, LAKEWOOD, NJ 08701, ATTENTION: ARBITRATION OPT-OUT.

**GUARANTY OF PERFORMANCE – Each of the undersigned Guarantors agrees to the following terms:**

29. **Guaranteed Obligations.** Guarantor agrees to irrevocably, absolutely, and unconditionally guarantee to Buyer prompt and complete performance of the following obligations of Seller (the "Guaranteed Obligations"):

   a. Seller's obligation to not (i) change any Authorized Account without the express written consent of Buyer, (ii) create any new depository account,  (iii) revoke Buyer's authorization to debit an Authorized Account, (iv) close an Authorized Account without the express written consent of Buyer or (v) take any other action that denies, or interferes with, Buyer's rights under this Agreement, including but not limited to Buyer's right to receive its share of revenue received by Seller;



b.   Seller's obligation to not conduct Seller's businesses under any name other than as disclosed to Buyer;

c.   Seller's obligation to not change any of its places of business without prior written consent by Buyer;

d.   Seller's obligation to not voluntarily sell, dispose, transfer or otherwise convey its business or substantially all business assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer;

e.   Seller's obligation to not enter into any other agreement for the sale of Future Receipts, or any loan agreement that encumbers Seller's Future Receipts or requires daily payments with any party other than Buyer without Buyer's prior written consent for the duration of this Agreement; and

f.   Seller's obligation to provide truthful, accurate, complete and timely information as required by this Agreement.

30.  **Guarantor Waivers.**  Buyer does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under the Agreement and this Guaranty of Performance if it is not notified of: (i) Seller's failure to timely perform any obligation under the Agreement, (ii) any adverse change in Seller 's financial condition or business, (iii) Buyer's acceptance of the Agreement, and (iv) any renewal, extension or other modification of the Agreement or Seller 's other obligations to Buyer.  In addition, Buyer may take any of the following actions without releasing Guarantor from any of its obligations under the Agreement and this Guaranty of Performance: (i) renew, extend or otherwise modify the Agreement or Seller's other obligations to Buyer, and (ii) release Seller from its obligations to Buyer.  Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under the Agreement or this Guaranty of Performance.  Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller, or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement or this Guaranty of Performance: (i) subrogation, (ii) reimbursement, (iii) performance, (iv) indemnification, or (v) contribution.

31.  **Guarantor Acknowledgement**.  Each Guarantor acknowledges that Guarantor understands the seriousness of the provisions of the Agreement, including the following Sections:  Credit Report and Financial Information Authorizations; Notices; Binding Effect, Governing Law, Venue and Jurisdiction; Authorization to Contact Jury Waiver; Class Action Waiver; and Arbitration and Right to Opt Out of Arbitration.

# alo capital group

**Signature Page to Sale of Future Receipts Agreement**

**Agreement of Seller:**  By signing below Seller agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

Seller: VEGAS CUSTOM GLASS LLC

By: 

(signature)

Name: VINCENT-JOSEPH TARINE REGALA

Title: OWNER

11



**Agreement of Guarantor:**  By signing below each Guarantor agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

Notice: This Agreement contains a guaranty of performance, and by signing below, you agree that you will be personally liable for the prompt and complete performance of the Guaranteed Obligations as described in the GUARANTY OF PERFORMANCE section above.

Guarantor Name: VINCENT-JOSEPH TARINE REGALA

By: _____

            (signature)

Name/title:_____
            (complete name/title only if Guarantor is not an individual)



2



**Early Delivery Schedule**

Subject to the conditions described in the Agreement, if during any Early Delivery Window described below, the sum of all Future Receipts that Seller has delivered to Buyer by Seller is equal to the applicable Discounted Purchase Amount described below, then Buyer will accept the Discounted Purchase Amount in full satisfaction of Seller's contractual obligations under the Agreement.

| EARLY DELIVERY WINDOW<br><br>Calendar days immediately following disbursement of funds | DISCOUNTED PURCHASE AMOUNT |
| --- | --- |
| 0-30 DAYS | $ 92,000.00 |
| 31-45  DYAS | $ 96,000.00 |
| 46-60 DAYS | $  100,000.00 |
|  | $ |

Seller's right to exercise the Early Delivery Option is subject to the following conditions (unless waived in writing by Buyer):

- None of the funds used to pay the Discounted Purchase Amount have been obtained from Buyer.

- Seller is not in breach of this Agreement at the time Seller exercises the Early Delivery Option.

- Seller must remit (and Buyer must receive) the applicable Discounted Purchase Amount in immediately available U.S. funds not later than 11:59 pm of the last date of the applicable Early Delivery Window.  (Seller acknowledges that it should contact Buyer to obtain instructions for wire/ACH or alternative payment instructions several days before it intends to remit the Discounted Purchase Amount.)

Seller's right to exercise the Early Delivery Option terminates immediately after the last day of the last Early Delivery Window.



**AUTHORIZATION AGREEMENT**
**FOR AUTOMATED CLEARING HOUSE TRANSACTIONS**

This Authorization Agreement is provided to Alo Capital Group LLC("Buyer") by each Seller identified on the Signature Page to this Authorization Agreement.  This Authorization Agreement is provided pursuant to the Sale of Future Receipts Agreement (the "Sale Agreement") entered into between such Seller and the Buyer.  Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Sale Agreement.

By signing this Authorization Agreement, each Seller agrees to the following:

Seller hereby authorizes Buyer to present automated clearing house (ACH) debits to the account identified on the Signature Page to this Authorization Agreement in the amount of any Periodic Amount due on a Remittance Day, or any other amount due to Buyer from Seller (or otherwise authorized to be debited) under the terms of the Sale Agreement, as it may be amended, supplemented or replaced from time to time.  Seller acknowledges that each such identified account is an "Authorized Account" as defined in the Sale Agreement.  Seller also authorizes Buyer to initiate credit entries to deliver the Net Funded Amount to Seller and authorizes Buyer to initiate additional entries (debits and credits) to any Authorized Account to correct any erroneous transfers.

If Seller breaches the Sale Agreement, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Sale Agreement.

Seller authorizes Buyer to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the Authorized Account and to correct any missing, erroneous or out-of-date information.

Seller represents and warrants that each Authorized Account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes.  Seller agrees to be bound by the Rules and Operating Guidelines of Nacha. Seller understands and agrees that any revocation or attempted revocation of this Authorization Agreement will constitute a breach of the Sale Agreement.  In the event that Seller closes an Authorized Account, or the Authorized Account has insufficient funds for any ACH transaction under this Authorization Agreement, Seller authorizes Buyer to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization Agreement to such additional account(s).  To the extent necessary, Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this Authorization Agreement.

Seller understands that the Authorization Agreement is a fundamental condition to induce Buyer to enter into the Sale Agreement. Consequently, this Authorization Agreement is intended to be irrevocable during the course of the Sale  Agreement and shall remain in full force and effect until Buyer has received all amounts due or that may become due to Buyer under the Sale Agreement.

[Signature Page follows]

# alo capital group

**Signature Page to Authorization Agreement**

By signing below, each Seller represents that it is the holder of the account identified immediately above its signature, and agrees that such account is an "Authorized Account" account as described in the Authorization Agreement.

| **Account Name:** (Name of account exactly as it appears on Seller's bank statement) | VEGAS CUSTOM GLASS LLC |
|---|---|
| **Bank Name:** | BANK OF AMERICA |
| **ABA Transit/Routing Number:** | 122400724 |
| **Account Number:** | ███████ |
| **Seller Signature** | VEGAS CUSTOM GLASS LLC<br><br>Signature: _____<br><br>Name/Title of signer: VINCENT-JOSEPH TARINE REGALA/ OWNER |



# alo capital group

## BANK INFORMATION

**\* Be sure to indicate capital or lower case letters.**

Bank portal website: _n/a_____

Username: _n/a_____

Password: _n/a_____

Security Question/Answer 1: _n/a_____

Security Question/Answer 2: _n/a_____

Security Question/Answer 3: _n/a_____

Any other information necessary to access your account: _n/a_____

If you have any questions please feel free to contact us directly at (732) 719-5732



1
2
3
4

**Exhibit "C"**

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>**Wolters Kluwer Lien Solutions 800-331-3282**<br>**B. E-MAIL CONTACT AT FILER (optional)**<br>**DL-WK-UCC-FILING@wolterskluwer.com**<br>**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>**Wolters Kluwer Lien Solutions**<br>**330 N. Brand Blvd., Suite 700**<br>**Glendale, CA 91203, USA** | Filed in the Office of<br><br>Secretary of State<br>State Of Nevada<br><br>Initial Filing Number<br>**2025496758-3**<br>Filed On<br>**July 28, 2025 12:02 PM**<br>Number of Pages<br>**1** |

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME **VEGAS CUSTOM GLASS LLC** | | | | |
|---|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS **6255 MCLEOD DR STE 21** | CITY **LAS VEGAS** | STATE **NV** | POSTAL CODE **89121** | COUNTRY **USA** |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME **SOFIAGREY LLC** | | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS **700 CANAL STREET FIRST FLOOR** | CITY **STAMFORD** | STATE **MD** | POSTAL CODE **06902** | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

ALL ASSETS NOW OWNED OR HEREAFTER ACQUIRED AND WHEREVER LOCATED, INCLUDING BUT NOT LIMITED TO, THE FOLLOWING SUBCATEGORIES OF ASSETS :A. ACCOUNTS, INCLUDING BUT NOT LIMITED TO, CREDIT CARD RECEIVABLES; B. CHATTEL PAPER; C. INVENTORY; D. EQUIPMENT; E. INSTRUMENTS, INCLUDING BUT NOT LIMITED TO, PROMISSORY NOTES; F. INVESTMENT PROPERTY; G. DOCUMENTS; H. DEPOSIT ACCOUNTS; I. LETTER OF CREDITS RIGHTS; J. GENERAL INTANGIBLES; K. SUPPORTING OBLIGATIONS; AND I. PROCEEDS AND PRODUCTS OF THE FOREGOING. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCER IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

| 5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative | | |
|---|---|---|
| 6a. Check <u>only</u> if applicable and check <u>only</u> one box:<br>☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check <u>only</u> if applicable and check <u>only</u> one box:<br>☐ Agricultural Lien ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | | |
| 8. OPTIONAL FILER REFERENCE DATA:<br>**105148327-72194319** | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated May 19, 2025, between Sofiagrey, LLC D/B/A eFinancial Tree ("eFinancial Tree"), the seller(s) listed herein (collectively, the "Seller"), and each guarantor identified below (each a "Guarantor") (all capitalized terms shall have the meanings ascribed to them below):

**Seller Legal Name:**   VEGAS CUSTOM GLASS LLC

**D/B/A:**   Vegas Custom Glass LLC

**Form of Business Entity:** LLC          **EIN #:** 85-3821419

**Physical Address:**   5924 sleepy fawn dr LAS VEGAS NV 89142

**Mailing Address:**   3750 SALT CEDAR IN LAS VEGAS NV 89121

| **PURCHASE PRICE:** | **PURCHASED AMOUNT:** | **SPECIFIED PERCENTAGE:** | **INITIAL WEEKLY INSTALLMENT:** |
|---|---|---|---|
| $ 100000.00 | $ 145000.00 | 8 % | $ 4531.25 |

**ORIGINATON FEE:** $ 3,995.00          **PRIOR BALANCE:** $

**AMOUNT PAID TO SELLER (AFTER DEDUCTING THE ORIGINATION FEE AND ANY PRIOR BALANCE):** $96,005.00

**FOR SELLER #1**                          **FOR SELLER #2**

By: _____              By: _____

**Name:**                                  **Name:** _____
 Vincent-Joseph Tarine Regala

**Title:** Owner/Agent/Manager            **Title:** Owner/Agent/Manager

**Email:**                                 **Email:** _____
 vcg702@gmail.com

**Business Phone:** 702-465-0413          **Business Phone:** _____

*Accurate contact information is required to provide the Seller with important information regarding the Agreement.

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guaranty of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to eFinancial Tree by the following Owner(s)/Guarantor(s) of Seller

**OWNER/GUARANTOR #1**                     **Name:** Vincent-Joseph Tarine
                                                   Regala
                                           **SSN:**  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

By: _____               **PHONE:** 0

**Address:** <u>5924 sleepy fawn dr</u>

**OWNER/GUARANTOR #2**

**By:** _____

**Name:** _____

**SSN:** _____

**PHONE:** _____

**Address:** _____

**WHEREAS**, Seller is desirous to sell to eFinancial Tree, and eFinancial Tree is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, eFinancial Tree and Seller hereby agree to the foregoing and as follows:

1. **Basic Terms and Definitions.**

   **a.** <u>"Effective Date"</u> shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when eFinancial Tree paid the Purchase Price to Seller. The obligation of eFinancial Tree under this Agreement will not be effective unless and until eFinancial Tree has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee and Prior Balance.

   **b.** <u>"Specified Percentage"</u> shall mean the percentage set forth in the preamble to this Agreement of Seller's Future Receipts.

   **c.** <u>"Future Receipts"</u> shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Dateof this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge,or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

   **d.** <u>"Weekly Receipts"</u> shall mean the amount of Future Receipts received by Seller on a Weekly basis.

   **e.** <u>"Purchased Amount"</u> shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and permit eFinancial Tree to debit pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.

   **f.** <u>"Purchase Price"</u> shall mean the total amount that eFinancial Tree agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from eFinancial Tree pursuant to this Agreement will be less than the Purchase Price by the total sum of the Origination Fee and Prior Balance, if any, set forth in the Preamble to this Agreement.

   **g.** <u>"Weekly Installment"</u> shall mean the amount that Seller and eFinancial Tree agree to be a good faith approximation of the Specified Percentage of Seller's Weekly Future Receipts. Seller and eFinancial Tree further agree that the Initial Weekly Installment set forth in the Preamble to this Agreement is based upon the information provided by Seller to eFinancial Tree concerning Seller's most recent accounts receivables, including representations by the Seller to eFinancial Tree regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

   **h.** <u>"Workday"</u> shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

   **i.** <u>"Prior Balance"</u> shall mean the sum of all amounts that Seller may owe to eFinancial Tree and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

   **j.** <u>"Origination Fee"</u> shall mean the fee that eFinancial Tree charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 20 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

   **k.** In the event <u>"Seller"</u> is comprised of more than one entity, then:

      **i.** The term "Seller" shall mean, individually and collectively, all such entities; and

      **ii.** Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by statute, or by contract; and

      **iii.** The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

      **iv.** The liability of each Seller under this Agreement shall be direct and immediate and shall not be

conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.** The terms "Specified Percentage", "Future Receipts", "Weekly Receipts", "Weekly Installment" shall mean the Specified Percentage, the Future Receipts and the Weekly Receipts of all Sellers jointly; and each Seller individually; and

**vi.** eFinancial Tree may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

l. In the event "Guarantor" is comprised of more than one individual, then:

**i.** The term "Guarantor" shall mean, individually and collectively, all such individuals; and

**ii.** Each Guarantor is an Affiliate of all other Guarantor(s); and

**iii.** The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

**iv.** The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.** eFinancial Tree may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

2. **No Fixed Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to eFinancial Tree pursuant to this Agreement are received by eFinancial Tree in full. Seller hereby acknowledges that it fully understands that: (i) eFinancial Tree's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to eFinancial Tree in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business eFinancial Tree's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely.

3. **Sale of Purchased Future Receipts.** Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto eFinancial Tree all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to eFinancial Tree (hereinafter, the portion of the Future Receipts sold by Seller to eFinancial Tree pursuant to this Agreement, the "Purchased Future Receipts"); to have and hold the same unto eFinancial Tree, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to eFinancial Tree of collectability of the Purchased Future Receipts by eFinancial Tree and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to eFinancial Tree full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

4. **Payment of Purchase Price.** The obligation of eFinancial Tree under this Agreement will not be effective unless and until eFinancial Tree has completed its review of the Seller and has accepted this Agreement by paying to Seller the Purchase Price (reduced by the Origination Fee and Prior Balance, if any).

5. **Use of Purchase Price.** Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

6. **Weekly Installments of Purchased Amount.** Subject to Seller's right of adjustment/reconciliation set forth in this Agreement, the Purchased Amount shall be delivered by Seller to eFinancial Tree Weekly in the amount of the Weekly Installment on each and every Workday commencing on the Effective Date and ending on the Expiration Date.

7. **Approved Bank Account and Credit Card Processor.** During the course of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) business-purpose bank account which bank account shall be acceptable and preapproved by eFinancial Tree (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by eFinancial Tree (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the course of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

8. **Authorization to Debit Approved Bank Account.** Seller hereby authorizes eFinancial Tree to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the Weekly Installment on each Workday commencing on the Effective Date until eFinancial Tree receives the full Purchased Amount;

The Weekly Installment is to be drawn via ACH payment, from the following bank account:

    **i.** Account Number: ███████████

    **ii.** Routing Number: 122400724

    **iii.** Account Name:  VEGAS CUSTOM GLASS LLC

    **iii.** Bank Name:   BANK OF AMERICA, N.A.

NOTE that this authorization is to remain in full force and effect until eFinancial Tree receives written notification from Seller of its termination in such time and in such manner to afford eFinancial Tree a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

9.    **Fees Associated with Debiting Approved Bank Account.** It shall be Seller's exclusive responsibility to pay to its banking institution and/or eFinancial Tree's banking institution directly (or to compensate eFinancial Tree, in case it is charged) all fees, charges and expenses incurred by either Seller or eFinancial Tree due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

10.    **Seller's Right of Reconciliation.** Seller and eFinancial Tree each acknowledge and agree that:

    **a.**    If at any time during the course of this Agreement Seller experiences a decrease or increase in its Weekly Receipts, Seller shall have the right to request retroactive reconciliation of the Weekly Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by eFinancial Tree (each such calendar month, a "Reconciliation Month").

    **b.**    Such reconciliation (the "Reconciliation") of the Seller's Weekly Installment for a Reconciliation Month shall be performed by eFinancial Tree within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by eFinancial Tree from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

    **c.**    One or more Reconciliation procedures performed by eFinancial Tree may reduce or increase the effective Weekly Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which eFinancial Tree will be debiting the Approved Bank Account may get shortened or  extended indefinitely.

11.    **Request for Reconciliation Procedure.**

    **a.**    Seller may initiate Reconciliation of Seller's actual Weekly Installments at any time by sending a request for Reconciliation to eFinancial Tree.

    **b.**    Any such request for Reconciliation of the Seller's Weekly Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements,and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by eFinancial Tree via email to George Ramirez <george@efinancialtree.com> with the subject line "REQUEST FOR RECONCILIATION."

    **c.**    Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and eFinancial Tree shall comply with each such request, provided that:

        **i.**    Each such request is made in accordance with the terms of this Section 11; and

        **ii.**    If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by eFinancial Tree from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

    **d.**    Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with eFinancial Tree's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by eFinancial Tree in full, or (ii) modify the amount of the Weekly Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month (s) as the result of the Reconciliation.

12.    **Adjustment of the Weekly Installment**. Seller and eFinancial Tree each acknowledge and agree that:

    **a.**    Seller and eFinancial Tree shall have the right to request modification ("Adjustment") of the amount of the Weekly Installment on a going-forward basis to more closely reflect Seller's actual Weekly Receipts times the Specified Percentage. eFinancial Tree will notify Seller prior to any such adjustment.  After

each adjustment made pursuant to this paragraph, the new dollar amount will be deemed the updated Weekly Installment until any subsequent Adjustment. If Seller requests an Adjustment, eFinancial Tree shall perform the Adjustment within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount ofthe Weekly Installment that shall be debited from the Approved Bank Account.

b.    One or more Adjustments performed by eFinancial Tree may substantially extend the term of this Agreement.

13.    **Request for Adjustment Procedure.**

a.    Seller and/or eFinancial Tree may initiate an Adjustment by sending a request for Adjustment to the other party in writing. Seller may request an adjustment via e-mail to George Ramirez <george@efinancialtree.com> with the subject line "REQUEST FOR ADJUSTMENT."

b.    Within five (5) Workdays following a request for Adjustment (an "Adjustment Request") Seller shall provide to eFinancial Tree's copies of: (i) Seller's most recent month's bank statement of the Approved Bank Account and month-to-date transaction activity, credit card processing statements and any aging reports immediately preceding the date of eFinancial Tree's receipt of the Adjustment Request.

c.    Seller and eFinancial Tree shall have the right to request Adjustment of the Weekly Installment as many times during the term of this Agreement as it deems proper, and eFinancial Tree shall comply in good faith with such request, provided that:

i.    Each such request for Adjustment is made in accordance with the terms of this Section 13; and

ii.    A request for Adjustment shall not be made after the Expiration Date.

14.    **Rights and Obligations of eFinancial Tree upon Receipt of the full Purchased Amount.** Upon receipt of the full amount of the Purchased Amount and any fees owed to eFinancial Tree under this Agreement:

a. eFinancial Tree shall notify Seller's bank and request from it to stop transferring Weekly Installments to eFinancial Tree's bank account.

b. If eFinancial Tree shall have received funds in excess of the Purchased Amount and any fees owed to eFinancial Tree under this Agreement, eFinancial Tree shall promptly return such excess to Seller.

15.    **Risk Sharing Acknowledgments and Arrangements.**

a. Seller and eFinancial Tree each hereby acknowledges and agrees that:

i.    The Purchased Future Receipts represent a portion of Seller's Future Receipts.

ii.    This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from eFinancial Tree. eFinancial Tree does not charge Seller and will not collect from Seller any interest on the monies used by eFinancial Tree for the purchase of the Purchased Future Receipts. The period of time that it will take eFinancial Tree to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after eFinancial Tree's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's reasonable control, eFinancial Tree may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

iii.    The amount of the Initial Weekly Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Weekly Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to eFinancial Tree.

iv.    The amounts of Seller's future Weekly Receipts may increase or decrease over time.

16.    **eFinancial Tree's Risk Acknowledgments.** eFinancial Tree agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and eFinancial Tree assumes these risks based exclusively upon the information provided to it by Seller related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give eFinancial Tree a reasonable and fair opportunity to receive the benefit of its bargain. eFinancial Tree assumes the risk that Future Receipts may be remitted more slowly than eFinancial Tree may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business went bankrupt or Seller otherwise ceased operations in the ordinary course of business.

ID: 14775863 Signed: 2025-05-21T09:39:39-05:00

17. **Application of Amounts Received by eFinancial Tree.** eFinancial Tree reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to eFinancial Tree from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

18. **Not a Loan.** Seller and eFinancial Tree agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by eFinancial Tree is not intended to be, nor shall it be construed as, a loan from eFinancial Tree to Seller that requires absolute and unconditional repayment on a maturity date. To thecontrary, eFinancial Tree's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to eFinancial Tree in full (if ever) are subject to and conditioned upon performance of Seller's business.

19. **Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes eachof those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless eFinancial Tree for any and all damages and losses (including without limitation legal fees and expenses) incurred by eFinancial Tree as the result of such representation being untrue, incorrect or incomplete.

20. **Origination Fee.** Seller hereby agrees for eFinancial Tree to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

**REPRESENTATIONS, WARRANTIES AND COVENANTS**

21. **Seller represents, warrants and covenants that as of this date and, unless otherwise stated, during the course of this Agreement:**

   a. **Financial Condition and Financial Information.** Seller's bank and financial statements, copies of which have been furnished to eFinancial Tree, and future statements which may be furnished hereafter pursuant to this Agreement or upon eFinancial Tree's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. eFinancial Tree may request Seller's bank statements at any time during the term of this Agreement and view-only access to Seller's bank account and Seller shall provide them to eFinancial Tree within five (5) Workdays. Seller's failure to do so is a material breach of this Agreement.

   b. **Governmental Approvals.** Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

   c. **Good Standing.** Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

   d. **Authorization.** Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

   e. **Accounting Records and Tax Returns.** Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that eFinancial Tree is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

   f. **Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

   g. **Electronic Check Processing Agreement.** Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede eFinancial Tree's rights under this Agreement,without eFinancial Tree's

ID: 14775863 Signed: 2025-05-21T09:39:39-05:00

prior written consent.

**h.**   **No Diversion of Future Receipts.** Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without eFinancial Tree's written permission.

**i.**   **Change of Name or Location.** Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and eFinancial Tree, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining eFinancial Tree's written consent.

**j.**   **Prohibited Business Transactions.** Seller shall not: (i) voluntarily transfer or sell all or substantially all of its assets (including without limitation the Collateral as such term is defined in Section 23 or any portion thereof) without first obtaining eFinancial Tree's consent; or (ii) make or send notice of its intended bulk sale or transfer.

**k.**   **Closing of Business.** Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of eFinancial Tree, and (ii) providing eFinancial Tree with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to eFinancial Tree. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until eFinancial Tree shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide eFinancial Tree ten (10) Workdays advance notice, to the extent practicable.

**l.**   **No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six (6) months immediately preceding the date of this Agreement.

**m.**   **Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) Workday's prior notice from eFinancial Tree to Seller, execute, acknowledge and deliver to eFinancial Tree and/or to any other person or entity specified by eFinancial Tree, a statement certifying that this Agreement is unmodified and in full force and effect or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been delivered.

**n.**   **Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

**o.**   **No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of eFinancial Tree.

**p.**   **Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

**q.**   **No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

**r.**   **Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants eFinancial Tree the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's Weekly receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants

ID: 14775863 Signed: 2025-05-21T09:39:39-05:00

eFinancial Tree and its employees and consultants access during regular business hours to Seller's employees and records and all other items of property located at the Seller's place of business during the course of this Agreement. Seller hereby agrees to provide eFinancial Tree, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow eFinancial Tree to interview any of those parties.

s.    **Phone Recordings and Contact.** Seller agrees that any call between Seller and eFinancial Tree and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with eFinancial Tree, its managers, employees and agents (collectively, the "eFinancial Tree Parties") and that Seller may be contacted by any of eFinancial Tree Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of eFinancial Tree Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

t.    **Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

u.    **Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by eFinancial Tree.

v.    **Consultation with Counsel.** The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

Y.    **No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and eFinancial Tree with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by eFinancial Tree or any of the eFinancial Tree Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the eFinancial Tree Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

Z.    **No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Origination Fee, if any, set forth in Section 20 herein, eFinancial Tree is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Section 2 hereof, such fee is not charged by eFinancial Tree. Moreover, as all working capital received under this Agreement is intended to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

aa.    **Credit Report and Other Authorizations** Seller and each of the Owners signing above authorize eFinancial Tree, its agents and representatives and any credit reporting agency engaged by eFinancial Tree, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement; (ii) obtain consumer and business credit reports on the Seller and any of its Owners; and (iii) to contact personal and business references provided by the Seller in any application, at any time now or for so long as Seller and/or Owners continue to have any obligations to eFinancial Tree as a consequence of this Agreement or for eFinancial Tree's ability to determine Seller's eligibility to enter into any future agreement with eFinancial Tree.

**PLEDGE OF SECURITY**

22.    **Pledge.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to eFinancial Tree (collectively, "Pledge") and grants to eFinancial Tree a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"),

whether now existing or hereafter from time to time acquired:

    **a.** all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    **b.** all Seller's proceeds, as such term is defined by Article 9 of the UCC.

**23.**    <u>Termination of Pledge.</u> Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, eFinancial Tree will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

**24.**    <u>Representations with Respect to Collateral.</u> Seller hereby represents and warrants to eFinancial Tree that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party.

**25.**    <u>Further Assurances.</u> Upon the request of eFinancial Tree, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as eFinancial Tree may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

**EVENTS OF DEFAULT AND REMEDIES**

**26.**    <u>Events of Default.</u> The occurrence of any of the following events shall constitute an <u>"Event of Default"</u> by Seller:

    **a.** Seller shall violate any term, condition or covenant in this Agreement.

    **b.** Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

    **c.** Seller shall default under any of the terms, covenants and conditions of any other agreement with eFinancial Tree (if any) which is related to the instant Agreement.

    **d.** Seller uses multiple depository accounts without obtaining prior written consent of eFinancial Tree in each instance.

    **e.** Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

    **f.** Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of eFinancial Tree in each instance.

    **g.** Seller intentionally interferes with eFinancial Tree's collection of Weekly Installments.

**27.**    <u>Default under the Agreement.</u> In case any Event of Default occurs and is not waived by eFinancial Tree, in writing, eFinancial Tree may declare Seller in default under this Agreement without notice.

**28.**    <u>Seller's Obligations Upon Default.</u> Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to eFinancial Tree the entire undelivered portion of the Purchased Amount and the Specified Percentage shall equal 100% of all Future Receipts. In addition, Seller shall also pay to eFinancial Tree, as additional damages, any reasonable expenses incurred by eFinancial Tree in connection with recovering the monies due to eFinancial Tree from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, <u>"Reasonable Damages"</u>).

**29.**    <u>Remedies Upon Default.</u> Upon Seller's default, eFinancial Tree may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:

    **a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of eFinancial Tree's security interest;

    **b.**  Enforcing the provisions of the Personal Guaranty of Performance against the Guarantor(s) without first seeking recourse from Seller;

    **c.**  Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to eFinancial Tree of all or any portion of the amounts received by such credit card processor on behalf of Seller;

    **d.**  Subject to arbitration as provided in Section 50 of this Agreement, commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guaranty) or any other legal or equitable right or remedy including without limitation eFinancial Tree's rights of a secured party under the UCC.

**30.**  <u>Remedies are not Exclusive.</u> Subject to arbitration as provided in Section 50 of this Agreement, all rights,powers and remedies of eFinancial Tree in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall bein addition to any other rights, powers or remedies provided to eFinancial Tree by law or equity.

**ADDITIONAL TERMS**

**31.**  <u>Seller Deposit Agreement.</u> Seller shall execute an agreement with eFinancial Tree that shall authorize eFinancial Tree to arrange for electronic fund transfer services and/or "ACH" payments of Weekly Installments from the Approved Bank Account. Seller shall upon request provide eFinancial Tree and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

**32.**  <u>Financial Condition.</u> Seller and its Guarantor(s) authorize eFinancial Tree and its agents to investigate their financial status and history and will provide to eFinancial Tree any bank or financial statements, tax returns, etc., as eFinancial Tree deems reasonably necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable for release of financial information. Seller hereby authorizes eFinancial Tree to receive from time to time updates on such informationand financial status.

**33.**  <u>Transactional History.</u> Seller shall execute written authorization(s) to its bank(s) to provide eFinancial Tree with Seller's banking and/or credit-card processing history.

**34.**  <u>Indemnification.</u> Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Sellerresulting from (a) claims asserted by eFinancial Tree for monies owed to eFinancial Tree from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by eFinancial Tree.

**35.**  <u>No Liability.</u> In no event shall eFinancial Tree be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

**MISCELLANEOUS**

**36.**  <u>Modifications; Agreements.</u> No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**37.**  <u>Assignment.</u> eFinancial Tree may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining eFinancial Tree's written consent.

**38.**  <u>Notices.</u>

    **a.**  eFinancial Tree may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at eFinancial Tree's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

    **b.**  Subject to Section 11 of this Agreement, Seller and Guarantor may send any notices to eFinancial Tree by e-mail only upon the prior written consent of eFinancial Tree, which consent may be withheld or revoked at any time in eFinancial Tree's sole discretion. Otherwise, any notices or other communications from Seller and Guarantor to eFinancial Tree must be delivered by certified mail,

return receipt requested, to eFinancial Tree's address as set forth in this Agreement. Notices sent to eFinancial Tree shall become effective only upon receipt by eFinancial Tree.

39. **Waiver Remedies.** No failure on the part of eFinancial Tree to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. Subject to arbitration as provided in Section 50 of this Agreement, the remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

40. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

41. **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York or the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State or Connecticut, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums. Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by eFinancial Tree by certified or registered mail, return receipt requested to the mailing address(es) listed on this Agreement, or via email address(es) listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

42. **Service of Process.**

    **IMPORTANT NOTICE -** THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

    a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for eFinancial Tree obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

        1. Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in this Agreement, or in eFinancial Tree's records, or any other mailing address provided to eFinancial Tree in writing; and

        2. Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in this Agreement, or in eFinancial Tree's records, or any other e-mail address provided to eFinancial Tree in writing.

    b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

        1. Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

        2. Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

            i. If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

            ii. If sent by e-mail, on the same day and time that the e-mail is sent;

        3. Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in this Agreement, and/or as provided to eFinancial Tree in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected to be received by them;

        4. Each Seller and Guarantor agrees and consents that eFinancial Tree may serve process on them directly,

including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if eFinancial Tree serves process directly on them; and

5. EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

43. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH EFINANCIAL TREE OBTAINING ANY PREJUDGMENT REMEDY AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE EFINANCIAL TREE TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) EFINANCIAL TREE'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) EFINANCIAL TREE MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION AGAINST ANY ONE OF THE UNDERSIGNED.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, EFINANCIAL TREE MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR EFINANCIAL TREE OBTAINING ANY PREJUDGMENT REMEDY.

44. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

**IMPORTANT NOTICE -** THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER

ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH EFINANCIAL TREE OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3.  WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE EFINANCIAL TREE TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, EFINANCIAL TREE MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) EFINANCIAL TREE'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) EFINANCIAL TREE MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

d.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR EFINANCIAL TREE OBTAINING ANY PREJUDGMENT REMEDY.

45.  <u>Survival of Representation, etc.</u> All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

46.  <u>Severability.</u>  In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

47.  <u>Entire Agreement.</u>  This Agreement embodies the entire agreement between Seller and eFinancial Tree and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

48.  <u>JURY TRIAL WAIVER.</u> THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

49.  <u>CLASS ACTION WAIVER.</u>  EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATEDWITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECUREDTHROUGH THE CLASS OR REPRESENTATIVE ACTION.

50.  <u>ARBITRATION.</u>  Notwithstanding any other provision of this Agreement, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators shall be appointed by RapidRuling. The place of arbitration shall be in New York or Connecticut, and any hearing shall be held via video or telephone conference. The parties agree that no objection shall be taken to the decision, order or award of the tribunal

following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THIS AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "SAFE SENDERS" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis. eFinancial Tree, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees shall be equally paid by the parties, and the commencing party shall be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. eFinancial Tree, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party shall be responsible for any attorney's fees, court or other fees associated with such actions. eFinancial Tree, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, eFinancial Tree, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

51.    **RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND** eFinancial Tree **A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT:** eFinancial Tree – **ARBITRATION OPT OUT,**

52.    **George Ramirez <george@efinancialtree.com>, ATTENTION: Arbitration Opt-Out.**

53.    **Counterparts and Facsimile Signatures.** This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR SELLER #1**                    **FOR SELLER #2**

By: _____        By: _____

**Name:** Vincent-Joseph Tarine Regala        **Name:**

**Title:** Owner/Agent/Manager        **Title:** Owner/Agent/Manager

**EIN:** 85-3821419                    **EIN:** _____

**AGREE TO BE BOUND BY THE PROVISIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.**

**OWNER/GUARANTOR # 1**              **OWNER/GUARANTOR # 2**

By: _____        By: _____

**Name:**  Vincent-Joseph Tarine Regala        **Name:**

**SSN:** ███████                      **SSN:**

**eFinancial Tree**

By: _____

**Name:**

**Title:**

# EXHIBIT A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is being executed and delivered by each undersigned ("Guarantor") in favor of eFinancial Tree, and its subsidiaries, affiliates, agents, and assigns (collectively, "Buyer"), in connection with that certain Future Receivables Sale and Purchase Agreement (the "Agreement"), dated effective as of [May 19, 2025   ] by and between Buyer and [VEGAS CUSTOM GLASS LLC          ] ("Seller"), a business entity that desires to sell certain of its Future Receipts to Buyer pursuant to the Agreement. Capitalized terms used herein have the meanings provided in the Agreement. Each Guarantor is a shareholder, member, partner or other principal owner of Seller or is an affiliate of seller that is owned and controlled by a shareholder, member, partner or other principal owner of Seller. Each Guarantor executes and delivers this Guaranty to induce Buyer to enter into the Agreement and purchase Seller's Future Receipts. Accordingly, each Guarantor acknowledges and agrees that Guarantor will receive substantial benefits from providing this Guaranty.

**SELLER # 1:**

Legal Business Name VEGAS CUSTOM GLASS LLC

D/B/A: Vegas Custom Glass LLC

**SELLER # 2:**

Legal Business Name _____

D/B/A: _____

**NOW, THEREFORE**, as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Guarantor does hereby agree as follows:

1. **Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

2. **Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's obligations under the Agreement (the "Obligations"); and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly perform (or cause to be performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

3. **Guarantor's Additional Covenants**. The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

   a.  any amendment, modification or extension of the Agreement or any Obligation;

   b.  any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

   c.  any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

   d.  any other guaranty now or hereafter executed by Guarantor or anyone else;

   e.  any waiver of assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

   f.  any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

   g.  the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

   h.  the failure to give Guarantor any notice whatsoever;

   i.  any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not voluntarily dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. Subject to arbitration as provided in Section 13 of this Guaranty, the remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipts is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of New York or the State of Connecticut without regard to principles of conflicts of law. Except as provided in Section 12 of this Guaranty, Guarantor submits to the nonexclusive jurisdiction and venue of any state or federal court sitting in New York State or Connecticut or otherwise having jurisdiction over this Guaranty and Guarantor, for resolution of any claim or action arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Guaranty are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**8. Service of Process.**

<u>**IMPORTANT NOTICE**</u> - THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for eFinancial Tree obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

1. Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in the Agreement, or in eFinancial Tree's records, or any other mailing address provided to eFinancial Tree in writing; and

2. Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in the Agreement, or in eFinancial Tree's records, or any other e-mail address provided to eFinancial Tree in writing.

b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

1. Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

2. Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

   i.    If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

   ii.   If sent by e-mail, on the same day and time that the e-mail is sent;

3. Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in the Agreement, and/or as provided to eFinancial Tree in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected to be received by them;

4. Each Seller and Guarantor agrees and consents that eFinancial Tree may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if eFinancial Tree serves process directly on them; and

5. EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

9. <u>PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.</u>

<u>IMPORTANT NOTICE</u> - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST THIS ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH EFINANCIAL TREE OBTAINING ANY PREJUDGMENT REMEDY <u>AFTER, BUT NOT UPON</u>, COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) EFINANCIAL TREE'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) EFINANCIAL TREE MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, <u>AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, EFINANCIAL TREE MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR EFINANCIAL TREE OBTAINING ANY PREJUDGMENT REMEDY.

10. <u>PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.</u>

<u>IMPORTANT NOTICE</u> - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH EFINANCIAL TREE OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, EFINANCIAL TREE MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) EFINANCIAL TREE'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) EFINANCIAL TREE MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR BUYER OBTAINING ANY PREJUDGMENT REMEDY.

11.  JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

12.  CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS GUARANTY); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

13. ARBITRATION. Notwithstanding any other provision of this Guaranty, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE AGREEMENT, THE SECURITY AGREEMENT AND/OR THE GUARANTY(S), OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED, CONFIRMED AND ENFORCED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators shall be appointed by RapidRuling. The place of arbitration shall be in New York or Connecticut and any hearing shall be held via video or telephone conference. The parties agree that no objection shall be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THE AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "safe senders" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis. BUYER, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees shall be equally paid by the parties, and the commencing party shall be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. BUYER, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party shall be responsible for any attorney's fees, court or other fees associated with such actions. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

14. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS GUARANTY. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS GUARANTY: EFINANCIAL TREE. – ARBITRATION OPT OUT, George Ramirez <george@efinancialtree.com> ATTENTION: Arbitration Opt-Out.

15. Severability. If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or

voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**16. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**17. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**                                         **OWNER/GUARANTOR #2**

By: _____                                 By: _____

**Name:** Vincent-Joseph Tarine Regala                        **Name:**

**SSN:** ███████                                               **SSN:**

**eFinancial Tree**

By: _____

**Name:**

**Title:**

**RIDER 3**

**TO THE [<mark>INSERT DATE</mark>]**

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")**

**Between eFinancial Tree ("BUYER")and**

<u>Vincent-Joseph</u>_____ ("Seller")
Tarine Regala

**<u>APPLICABLE FEES</u>**

1. **<u>Possible Conflicts</u>**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **<u>Definitions</u>.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

3. **<u>Applicable Fees.</u>** The parties agree that the Applicable Fees which Seller shall pay to Buyer, pursuant to Section 17 of the Agreement shall be as follows:

    A. **ACH Program Fee:** _____ (charged monthly to cover expense of ACH processing program).

    B. **UCC Fee:** _____ (part of filing UCC financing statements and their terminations).

    C. **Wire Fee** ___.___ (deducted from the Purchase Price to cover cost of remitting the Purchase Price).

    D. **NSF Fee:** <u>35.00</u> (to cover expense of an NSF – if this occurs twice in a row, the third occurrence constitutes a default under the Agreement).

    E. **ACH Rejection Fee:** ___.___

    F. **Bank Change Fee:** _____

    G. **Blocked Account Fee:** <u>135.00.</u>

    H. **UCC Release Fee:** _____

    I. **Additional Broker Fee:** _____.

    J. **Stacking Fee:** <u>5,000.00</u> **(in the event Seller takes additional capital without written consent of Buyer).**

4. **<u>Authorization.</u>** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to theAgreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivery to Seller.

5. **<u>No Reduction of Purchase Price.</u>** Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed a reduction of the Purchase Price.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.**

**FOR THE SELLER**                    **FOR THE BUYER**

**By:** _____        **By:** _____

**Name:** Vincent-Joseph Tarine Regala    **Name:**

ID: 14775863 Signed: 2025-05-21T09:39:39-05:00

**RIDER 2**

**TO THE [<mark>INSERT DATE</mark>]**

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between eFinancial Tree**

**("Buyer") and** Vincent-Joseph Tarine
Regala
**("Seller")**

**<u>PRIOR BALANCE</u>**

1. **<u>Possible Conflicts</u>**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **<u>Definitions</u>.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein in.

3. **<u>Prior Balance.</u>** Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

**TOTAL PRIOR BALANCE:  $** $0.00 ; $0.00           owed to: [name of creditor]

4. **<u>Authorization.</u>** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 19 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to Buyer and/or the creditors listed in this Rider.

5. **<u>No Reduction of Purchase Price.</u>** Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

6. **<u>Indemnification.</u>** Seller hereby indemnifies and holds harmless Buyer for any and all damages and losses (including without limitation legal fees and expenses) incurred by Buyer as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                              **OWNER/GUARANTOR #2**

**By:** _____                    **By:** _____

**Name:** Vincent-Joseph Tarine Regala              **Name:**

**eFinancial Tree**

**By:** _____

**Name:**

**Title:**

RIDER 1

TO THE [INSERT DATE]

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between eFinancial Tree**

("Buyer") and _____

("Seller")

**ORIGINATION FEE**

1. **Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated.

3. **Origination Fee.** The parties agree that the Origination Fee that Seller shall pay to Buyer pursuant to Section 20 of the Agreement shall be:

   $3,995.00

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 20 of the Agreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

5. **No Reduction of Purchase Amount.** Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchased Amount.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                            **OWNER/GUARANTOR #2**

By: _____                     By: _____

Name:  Vincent-Joseph Tarine Regala              Name:

**eFinancial Tree**

By: _____

Name:

Title:

("Agreement")



ID: 14775863 Signed: 2025-05-21T09:39:39-05:00



**List of top 5 clients – Please list the top 5 clients that you are currently providing services for / have provided services for in the past 30 days.**

Business Name: vegas remodel

Contact Name: ryan cave

Phone Number: 702 994-7011

Does the client owe you money? Yes yes        If so, Amount: $ 72,000


Business Name: forte building group

Contact Name: luke honett

Phone Number: 702 697-2000

Does the client owe you money? Yes yes        If so, Amount: $ 48,000


Business Name: martin harris

Contact Name: jonathan issacs

Phone Number: 702 385-5257

Does the client owe you money? Yes yes        If so, Amount: $ 62,000


Business Name: builders united

Contact Name: sean perkins

Phone Number: 702 706-2842

Does the client owe you money? Yes yes        If so, Amount: $ 26,000


Business Name: pwi construction

Contact Name: natalie presto

Phone Number: 702 942-8400

Does the client owe you money? Yes yes        If so, Amount: $ 70,000


Signature here:

# Clixsign Completion Certificate

## Signature Package Details

| Final Status | Final Status Date | Package Title | Package ID | # of Signers |
|---|---|---|---|---|
| Completed | 2025-05-21T09:39:39-05:00 | Agreement [weekly] | 14775863 | 1 |

## Sender Information

| Name | Email Address | IP Address | Sending Entity |
|---|---|---|---|
| Joana Pardilla | submissions@efinancialtree.com | 120.29.86.154 | Sofiagrey |

## Signers

| Vincent-Joseph Tarine Regala | SIGNER 1 | | | |
|---|---|---|---|---|

**Email Address**
vcg702@gmail.com

**IP Address**
24.234.86.6

**User Agent**
Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/136.0.0.0 Safari/537.36

**Package Opened At**
2025-05-21T09:13:27-05:00

**Signature Adopted At**
2025-05-21T09:14:41-05:00

**Package Signed At**
2025-05-21T09:39:39-05:00